Thank you, Your Honor, and may it please the Court. My name is David Wiener. I'm counsel for the appellant, B.P. How many of these arguments have you made, Mr. Wiener? I've had a few, Your Honor. How many? I think this is my fourth or fifth. Only four or five? Only four or five. This, as you know, is an appeal from an award by the Deepwater Horizon Settlement Program. And the award here is contrary to the plain language of the agreement, and it also is contrary to common sense. Even though the claimant is part of one of the world's largest companies, the settlement program, the appeal panel, and the district court, nonetheless, all engaged in a fiction. But the fact that they're one of the world's largest companies, that's not relevant, is it? That's just sort of atmospherics, as I understand it. I mean, let's say there was never a Walmart store in past Christiane in 2003, and this is the first time they built one there, and then it opened at the time the new store opened. We would still be considering whether they meet the startup business requirements, right? It doesn't matter that they're part of the largest company in the world. So, Your Honor, if this were a scenario where it never had the prior period of operations and they were only opening for the first time in this location less than 18 months before the spill, then I agree that's correct. It doesn't matter whether it's Walmart or Piggly Wiggly or whatever. But I think it does make a difference here, and the reason for that is because the test for determining whether or not you're a standard bail claimant or a startup business claimant, you're looking at the totality of circumstances to determine when is the operating history. When does that operating history begin? And so when you're taking into account that they operated beginning in 2003 for almost two years, and then you have this period of dormancy, when they go back and they reopen at the same location— Well, your brief characterizes the period of dormancy as they temporarily closed, right? The fact of the matter is that Katrina came and blew them away. Isn't that the fact? It was Katrina. Come on. It was closed. There was no operation. We don't dispute. There was no period of operation. There was no operations for that period of time. Do you also not dispute that then Walmart bought, what, 34 additional acres to build a new store? They expanded the size of the store and reopened at the same location. It's the same business line. But, Your Honor, if I can go back to the question where you started with, why does it matter who the claimant is? And when you compare this to, for example, the claimant in 3813, this is the other post-Katrina closure panel decision. Is that the Nike company or the metal? That was the Sporting Good, which had basically a mall kiosk, right? That looks like an actual startup business. Here, when they reopened the store in October of 2009, they're not starting fresh. They are building off of an existing infrastructure for sourcing inventory. They've got name recognition both nationally from advertising, but also they have the name recognition from their prior store in that same location. They have massive amounts of capital that they can draw upon in order to begin their operations. And contrast that to 3813. What if that would be different? I mean, if they had never built the Past Christiane store in 2003 and they were just starting it up in 2009 or 2010, wouldn't you be able to say the same thing? They're drawing on the name. So I think the critical distinction is that we have the language of the agreement itself and the language, the definition of a startup business. This is a contract that we're interpreting, 38.137, which is the definition of a startup business. It says that you're looking at are there business operations, do they have more than 18 months of operations at the time of the spill? So that doesn't say anything about continuity of operations, which is essentially what the claimant's position requires. That's what the appeal panel decision here requires is that you're inserting a new requirement into the definition of startup business in 38.137. And so our interpreters agree with you to some extent, Your Honor, that if this were an opening that occurred for the first time at that location within 18 months of the spill, we would be dead in the water. We wouldn't have an argument. It wouldn't matter if it were Piggly Wiggly. It wouldn't matter if it were a mom-and-pop operation or if it were one of the world's largest corporations. But that's not the case here. What is the word in 38.137? That's the language, right? It just says a business. What is that a reference to, a business? So that I think, you know, you turn to we've got these policies. First of all, you have Exhibit 7, which provides some additional clarification, and then you've got the Policy 362. I know it's not binding on us, the policies. Maybe it's not binding on anybody. But are you accepting the policies as relevant guidance in interpreting the settlement agreement? So there are two things. Number one, with respect to Policy 362, we have not specifically challenged the policy. You're right, it's not binding on the court. The language of the agreement is what's binding. 362, I think, provides helpful flavor to understanding this. The other thing that I'll refer you to, Your Honor, I don't think any of the parties cited it in the briefs, but there actually is a decision from this court that talks, I think, almost directly to your question, and that's the Holmes decision. If we reel back the clock, about 50 Deepwater Horizon cases back to 2016, and that addressed, I think, that may be the only Fifth Circuit decision that specifically addressed what is a startup business. And the issue there, that was a claimant topside appeal, and the claimant was essentially arguing that it was, I think, an automobile dealership, and maybe they started leasing cars, and they tried to make an argument that leasing was a new line of business, and therefore they were a startup. And this court said it doesn't work like that. The entity is the claimant, not the business line. So I don't know if that gets exactly what you're getting at. The other point, I think, is that the last sentence of Policy 362 also addresses what you do in the case of a multifacility client. All right, so that says, for multifacility business, that's what we got here, right? Correct. Claimants that elect to file separately for each individual facility, that's what Walmart's doing. Claims administrator will perform an analysis on each facility. That's correct. Where does that cut? Well, so that would suggest that the analysis as to whether you're a Bell claimant or a startup business claimant is being done on a claim-by-claim basis. So this particular corporate entity that filed the claim, it's actually called Walmart East Stores LP or Stores East LP, and that owns a number of stores, I think, in the East and Gulf Coasts. And they filed claims on behalf of I think it's about nine separate stores. But you wouldn't take the position that, therefore, we consider all of those stores in Globo and whether they are in Globo startup businesses, right? We would go store by store. That is certainly the reading. That's what Policy 362 would suggest is that that's how the analysis is carried out, and I think that's how the analysis was performed at the CSSP level and at the appeal panel level. And just to be open, we were here a couple of weeks ago arguing about four or five of the other stores which were consolidated altogether. Those stores were separate claims. They were, as I said, consolidated, and they had completely separate issues, and they were treated as standard Bell claimants, not as startup business claimants. Did you argue that case? I did, Your Honor. Who was the panel? It was, I'm blanking for a second, Judge Southwick, Judge, I'm blanking now. My colleague on the other side will know as well. But so to get back to your question, we are looking at this specific store as the entity, but as we started off with, the fact that it is part of this essentially massive corporate empire, I do think is relevant when you're assessing the totality of circumstances to figure out, does it make sense to treat this as a startup business? Well, go ahead. As we argue in the brief, we have the plain language of 38.137, which does not include this requirement for continuity of operations that claimant is arguing for and that the appeal panel essentially adopted. But what's more, we have to give these terms common sense meanings, and the application of the startup business nomenclature to this particular claimant, even when you're doing it on a store-by-store basis, simply flies in the face of common sense. Oh, but speaking of common sense, if we agree with you that this facility is not a startup business, they get zipped, right? And the reason for that, Your Honor, well, that happens all the time to claimants. There are countless claimants that don't get compensation. This isn't free money. I mean, as – well, but they have to qualify. They have to qualify. And the reason they don't – Well, they're a business, right? So they're not a startup business, so maybe they're a BEL. And the reason – Well, because they don't have the records that would qualify them under the three periods, right? That is not correct. The reason they don't qualify under the BEL framework is because they were making more money in the post-spill period. They have this argument that there has to be – More money than what? Than in the pre-spill. So when they start up – so if you look at the frameworks, in the benchmark period, they open in October 2009. And essentially from the get-go, they're making millions of dollars. I think October 2009, it's something like $2.9 million, even though it's not a full month. Then for the remainder of 2009, which is one of the benchmark periods, on an average monthly basis, they're earning something like $4.2 or $4.3 million. I don't remember the exact number, but I know we have it in the brief. And then in the post-spill period, in the compensation period under the BEL framework, their revenue, their profits, it goes up. They're making more money in the period immediately after the spill than they are before it. That's why they don't qualify under the BEL framework. Now they make this argument, a structural argument, and I think it's notable that they've pivoted to making this structural argument because the plain language doesn't help them. But their structural argument essentially is because we don't have revenue from every month in 2009 or – and I think they say this in a footnote – because we don't have revenue for all of October 2009, we essentially can't even get in the door to file a BEL claim. And that is just not true. There is nothing in the agreement that says that. I'm not aware of any appeal panel decisions that say that. They didn't qualify for a BEL claimant because they didn't qualify. They were making more money in the post-spill period under – in the compensation period. I should know this, but why is it – what is it about the startup BEL curve that makes such a difference here in the formula? So under the startup framework, both the compensation and benchmark periods are in the post-spill period. And so the idea behind the framework, of course, is that if you're a startup business, if you're entering into operations less than 18 months before the spill, then the spill hits. That sort of upends everything. And if you're a new business, you just don't have the track record to have the revenue and build up profits to be able to qualify as a BEL claimant. Whereas if you look purely in post-spill periods to determine the compensation and benchmark periods, that makes it somewhat easier for a brand-new business to qualify. So that, I think, is the logic behind the startup framework as opposed to the BEL framework. I think the argument is made that there's nothing really in the settlement agreement that contemplated the situation at hand, in this dormancy period. I don't remember if that's you or your counsel opposite. But that seems to – it's interesting that BP didn't come in and say, well, they don't have a claim because the settlement agreement doesn't cover this. But you didn't make that argument. So because it's ambiguous, it seems it makes it all the more discretionary on the part of the appeals panel. So I disagree that it's ambiguous. I think there is a fundamental distinction in contract law between – Well, okay. Then do you agree it's not contemplated in the settlement agreement? Well, I disagree with that. I think you look at the plain language, and the plain language of 38.137 does not have a requirement for continuity of business operations for the 18 months before the spill, full stop. That's where the analysis begins and that's where it should end. The parties could have agreed to a very different framework, and they could have said you have to be continuously operating for 18 months beforehand. They didn't do that. Now, is it the case that as all those lawyers and businessmen and women were sitting down in conference rooms hammering out this settlement agreement, did somebody sit there and have foremost in their mind the dormancy scenario? I honestly don't know. I think it's just as likely that they didn't as they did. But you don't even get to that unless they make the threshold showing that the agreement is unclear, and it's not. It does not have this continuity requirement that they are focused on, and I think you see that most clearly in the 2015 38.13 opinion, which is the other panel opinion on the post-Katrina claim, and essentially the panel opinion here follows that. And what they say there is that that claimant was a startup business because its second period of operating history was less than 18 months before the spill. Well, 38.137, the definition of startup business, it doesn't say anything about second operating histories or successive operating histories. We've got your argument. Thank you very much, Your Honor. Thank you. How about beginning with the question I ask your counsel officer? I'm sorry if I can't remember that question because I came up. My name is Trey Peacock, and I'm here for Walmart. The fact that nothing in the settlement agreement contemplated the situation at hand. I believe the language in the agreement does contemplate the situation at hand. I think BP has, with some artful language, attempted to create an ambiguity that does not exist. There is simply no question in our mind on behalf of Walmart that this was a new store. Prior to the building of the store, which did not begin construction until October of 2008 and its completion in October of 2009, didn't exist. The prior store was wiped off the face of the planet. It was not temporarily closed. It was not dormant. It was gone. You're talking about the physical store was, but it was an operating business. It had that store, like many other stores, had been an operating business, but it did not like the appeal decision in 3537 where that business, the metal products business, it never stopped operating. It continued to operate. It did not sell as much, but the appeal decision makes clear that they continued to sell existing inventory throughout the period past the time of the spill, and it was only after the spill that they stopped selling any products and closed their business. So it wasn't even dormant. And the appeals panel ruled that what? That was a BEL, not an SBEL? Correct. They viewed that was a BEL and that it was a close call. So the sharp downturn in business there was not enough to convert it into a startup business. Correct. Do you recall what position BP took in that case? They took the position, as I recall, that it should be classified as a BEL.  That's not correct. They took the position. I apologize, Your Honor. They took the position that it should be treated as a startup business, and the claimant prevailed in his position of arguing, look, I know my business, and here's how it worked. I'll ask him about that. But I thought they took the position that that was a startup business, and they lost. And the appeals panel said, no, it's a BEL, which is perplexing to me if that's the case because now it seems like we're taking a different position. They're taking a different position. But anyway. If I may, Your Honor, while I'm up here because you asked, and it was the first thing I wrote down, if it helps you, the other two members of the panel, I was also here for the last case, were Judges Graves, and I'm almost positive Judge Engelhardt. Judge who? Engelhardt. Okay. But if I can go back, Your Honor. So, as I said, here we don't think there's a pressing issue. Policy 362, we've had some discussion about that now, made clear that the test here is a totality of the circumstances. And one of the elements is when did the business begin to perform its full-time services while physically present in the Gulf Coast areas? And there is a dividing line per Policy 382, Version 3, between claims being either a BEL or a startup claim. And a startup is one with less than 18 months of operating history at the time of the spill. This store, like many other stores of the Walmart system, this one was brand new, entirely built in 2008 to 2009, and opened on October 14th, less than six months before the spill. BP's use of language like dormancy, temporarily closed, closed for remodeling, are not applicable here. None of those things were true. None of those things happened. Walmart would have happily kept that store open, but it was destroyed by Hurricane Katrina. I've seen pictures in your brief. I mean, they look pretty bad. It doesn't look like it was totally destroyed. But did Walmart then destroy it? Walmart had to go ahead. If you've seen the pictures, you can see part of the walls are still up. But because of safety issues and engineering issues, the entire remaining walls had to all be torn down. And I didn't grow up here. I live in Houston. But to understand what happened to the past Christian community, it wasn't just that the store was destroyed. There were no customers for that store for many years because the community was badly, badly impacted, and people did not come back and start moving in, as I understand it, so that the community rebuilt for many years. That took time. Is that data in your claim? Yes. There's a reference in one of the footnotes to an article that describes that. And so because we were not physically present, because we didn't have any customers, it's not until fall of 2009, October, that the store gets open. And it's also important to focus on exactly what the settlement administrator focused on when they made their decision as to when we were a startup business. First, they looked at our profit and loss statements, which we had given them for all of 2009, and they showed no activity until October of 2009 when that Walmart store began doing what it does, which is selling goods to its customers. But second, they came back to us, to me actually, and asked us for further evidence. And we provided them, because they asked for it, which was our business license. We didn't have the right to conduct business at that location prior to October 2009 after the destruction of the prior store. We had to obtain and get a license to do that and to collect sales taxes. That leads to sort of the argument you referenced, Judge Duncan, which is it is, in fact, BP's position, the way they have articulated it, that this is a heads, BP wins, tails, Walmart loses position, but not for the reasons I think my colleague has clearly articulated. One of the requirements, the actual documentary requirements, in Exhibit 4A of the settlement, Item 5, is that Walmart has to be able to provide, or any claimant has to provide, financials for the full benchmark year sought, which at a minimum is 2009, all of 2009, and your monthly sales tax reports. I can tell the panel that Walmart has actually submitted, I think it was 11 claims, all of which I handled, and a number of those were denied for this very reason, lack of monthly sales tax reports. So if we were now treated as a BEL, it's not about our profitability. I'll get to that in a moment. We would be denied because we lack the very records because we weren't in business. This was a new store, and we will be denied, we fully expect, because we don't have nine months of the 12 months of sales tax reports required in order to comply with the explicit written requirements of the agreement. This all strikes me. I'm just trying to think of this logically. That's where you get in trouble. I know. The casualty loss caused Walmart to shut down. Let's say there had been a fire there, and this doesn't seem like the intent of the settlement agreement was to give you, treat you as a startup because of a casualty loss. In other words, Walmart's lack of data for that period was nothing to do with the oil spill. It was everything to do with the casualty loss. For example, it's sort of like, to me, more analogous to the basketball player who, yes, he doesn't have income or whatever, but it's not because of the oil spill. It's because you're comparing something more like a casualty loss, just logically speaking. If you're following my argument or my thinking here. And I think the difference here is, Your Honor, is it goes to a question also Judge Duncan asked, and I think my colleague agrees, is if Walmart had not built a store ever in Past Christian until October of 2009, they acknowledged, they're not suggesting because Walmart has been in existence for decades that we can't have a startup business. They are acknowledging, I think, that. Their point, though, is you did have a store there. But, again, if we opened a second store in Past Christian, Mississippi, that, too, would be a different store. Here, I think the distinction is, and it's why I think the appeal panel decision is relevant, the second one that involves the water sports business is like that. This was an instance where the business wasn't in existence. It was destroyed. And the agreement, from a common-sense perspective and the structures of the BEL and the startup, is designed that you would be in one or the other and make your claim. Policy 382 talks about there's a dividing line. Based on period of operations, you're either one or the other. But here. But the startup business is designed to get people who don't have enough experience and a track record because they know that when you start from scratch, it's going to take time to get customers and all of that. Typically speaking, they're giving a benefit of the doubt to a startup because it takes them a while to get legs, whereas this has been a store that had legs. And as soon as it opened up, its legs were even stronger. It's not a typical startup. If I may respond in two parts, Your Honor. First is I think this is a new store because it did have the legs cut out from it. It did not know when that store reopened was it going to be able to take off. Not all Walmart stores succeed. And in this instance, they were coming back into a community that had been devastated. They did not know how big their customer base would be. I also want to address because my colleague has also mentioned this, and I think it's a bit of a false dichotomy, but this notion that we were more profitable in 2010 than 2009 is, in fact, not accurate. And we addressed this in one of our footnote two. And it's not accurate for a couple of reasons. First is this store is in what's called zone A of the settlement agreement, which means there's no causation requirement. We're not having to prove how much we recovered or did better. The second part is the numbers they have quoted to you, which suggest a higher monthly average revenue in 2009 than 2010, is simply based on the fact that they treated all of October as a month where we were in operations. But the exhibits that they submitted to the appeal panel make clear from the news articles the store did not open until October 14th. We had a license to begin on October 1, but the store did not open until October 14th. And if you simply make the adjustment of having two and a half months of revenues and dividing the full revenues for 2009 by 2.5 instead of 3, it dramatically shows that, in fact, this store was doing better in 2009, 5.16 million, versus 2010 when it did 4.6 million. So I don't think that's a fair comparison. And their one point about this in the brief was simply, well, there's no evidence that the store opened October 14th. That's not correct. The record excerpts that we have submitted that they are the ones who originally gave to the appeal panel, particularly if you look at ROE-4 and ROE-1, make that clear. I also want to turn briefly to the appeal decisions. I do think that is one of the bases the court can overturn Judge Barbier's decision not to grant discretionary review, which is if there's a split in the appeal panel decisions. But I really think a careful review of those shows that's not the case. As I mentioned, the metal products manufacturer case, which is 2017-3537, the decision makes clear that they never stopped doing business. They continued selling their existing inventory from January 2008 until 2013. So they weren't impacted by a hurricane or by an act of God. They didn't lose their store and their physical operations. They didn't lose their customers. And they never stopped doing business. So I don't think that is analogous really in any way to our situation. The second case, the 2017-3813, the water transportation equipment business, is directly analogous, as BP itself concedes. They were wiped out. Their store went out. They had no location. They had no inventory. They had no sales. And then they decided to open a new store in 2008, and the panel found that satisfied the criteria for a startup business and upheld their claim. I sense because, but it just came up, there was this discussion with you, Judge Duncan, about Walmart being a big corporation. I agree with you. I do not think that's relevant at all. And I think counsel has now conceded, as he said, is that they're not using Walmart's sort of general corporate existence as a basis to deny a particular location from being a startup business. And all of the claims that have been submitted to date have been treated separately. And I just want to clarify, yes, the five cases, the five other claims for five stores that were appealed, they were not consolidated into one claim. The claims were consolidated because that case involves some accounting issues that were consistent. There was a consistent accounting issue across all five, and rather than have five separate arguments on accounting procedures, we both mutually agreed to do that all in one. Yes. But that other panel dealing with the five stores, and we'll go look at the docket, of course, in the briefing, but those issues have nothing to do with the so-called dormancy issue. Nothing whatsoever. I'm sure my colleague will agree. There is no overlap of any issues or, frankly, facts in those cases other than Walmart. So finally, Your Honors, I would simply note, under the totality of circumstances test, the settlement administrator correctly determined and confirmed this was a startup business claim. They did what they were charged with doing, and they did it properly. They looked at our financials. They looked at our profit and loss activity and the lack of activity prior to October of 2009, which was only six months before the spill, well within an 18-month period for a startup business. And they looked, importantly, I think, at the business license issue in October of 2009. The appeal panel rightly concluded that this store met the startup business requirements, and the district court properly declined discretionary. I mean, if we agreed with you, our role here as an appellate panel is not to go and resolve this issue with respect to, you know, what does the settlement agreement mean. I mean, maybe I want to know whether you agree with this or not. It's not to do that. It's not to make some definitive ruling on what does the settlement agreement mean with respect to this scenario, but simply to rule whether Judge Barbier was within his discretion to deny review. Is that what you think our role here is? Absolutely, Your Honor. I would simply note in conclusion the Fifth Circuit has previously made clear in its 2008 decision that the district court does not abuse its discretion when appeal simply raises the correctness of a discretionary administrative decision in the facts of a single case, and I believe that decision is of some relevance here. And unless there are any further questions from the panel, thank you for your time. I'll give you a little bit of advice. It's past Christian. Thank you, Your Honor. Past Christian. I have been corrected on that before, and I unfortunately have not caught the mistake. I apologize, Your Honor. It's a different country. Your Honors, this case begins and ends with the plain language of 38.137, and that's why, Your Honor, we can't just say that Judge Barbier didn't abuse his discretion in denying review. One of the prongs for when he's required to exercise review is a substantial misapplication of the agreement. What word did he misread or should he have read more correctly? He inserted language into 38.137. There is nothing in 38.137 that defines a startup business that requires a continuity of 18 months of business operations in the pre-spill period. That is simply not in there. If I consider the business in that definition the new store that was built after the catastrophic destruction of Katrina, then we have no problem with the settlement agreement. But the store, it's the exact same business, Your Honor. They're doing the same thing. They're at the same location. Walmart assigned it the exact same store number. One of the key benefits of our approach in following the plain language, it gets you, it gets Judge Barbier, it gets the appeal panels, the CSSP, out of the business of having to draw these lines. Are they completely out of business? Are they dormant? What are they doing? You don't have to do that. The settlement agreement resolves it for us by just speaking to whether or not you have business operations more than 18 months from the date of the spill. How many claims involve Katrina losses that are like this, where there was a period? Where they were wiped out. I think there is this claim and 3813. I'm not specifically aware of other claimants that were in operation before Katrina, they were knocked out, and then they resume operations in the immediate pre-spill period. 3537, however, is still directly relevant. To answer your question, Your Honor, that's correct, Your Honor, and we did have a different position there. We lost that one. BP took the position in the metal products case that it had experienced a severe downturn. It wasn't selling anything. It wasn't selling anything, sorry. Correct. And BP's position in that case was it should be evaluated under the startup business. That's right, and we lost that. And so to then, it can't be the case that the rules are different if the claimant is taking the position or if BP is taking the position. The panel took a position in that case. We argued consistent with what the panel said there. To just say that that claimant had a downturn in business, however, dramatically, I think, understates what actually happened there, and if you look at the panel decision, it's in our record excerpts at 35, and what they say is that claimant experienced no sales between the months of January 2008 and April 2009. That's not just a downturn in business. These guys were getting wiped out. They didn't report any COGS, they didn't report any salaries or any contract labor on their tax returns for 2008 or 2009. Now, you can get into the business. You can get the CSSP into the business of finally making these distinctions between claimants like 3537 and Walmart here and 3813, but the easiest approach is just to follow what the language says, not add any new requirements into it, and look and see, are they in operations more than 18 months before the spill or not? And here it's undisputed. That flies in the face of the policy about totality of the circumstances because I don't know what all the evidence was that was put in on the devastation to the past Christiane area, but there was quite an impact on that area that would affect the customer base. And so you can say, well, Walmart was a big store. Okay, we'll consider that a big company. But on the other hand, what was their customer base? There are just so many factors, and that's why we have these discretionary decisions within the context of the settlement agreement. And, Your Honor, if you look at the totality of circumstances, using the period of operations where it was indisputably in business before Hurricane Katrina, that establishes, that satisfies those requirements, satisfies the requirements from October 2009 until the spill. And there is no question that Katrina had an impact, but there's also no question that looking at the plain text satisfies the requirement for a bail claim and disqualifies them from proceeding under the startup framework. And unless you want to get into figuring out all these gray areas, following the plain text is the easiest way to go. That's for the claim administrators. There's no further questions. Thank you, Your Honors.